2026 IL App (2d) 250530-U
No. 2-25-0530
Order filed July 29, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

*In re* ESTATE OF MEGAN ANN SCHLAISS, Deceased

(Petitioner-Appellee, Debra Schlaiss, v. Nathan Nicholas, Contemnor-Appellant).

Appeal from the Circuit Court of Kane County.
Honorable Joseph M. Grady, Judge, Presiding.
No. 21-P-657

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court properly found decedent's fiancé in contempt of court for failing to turn over the decedent's cremains and personal items to the estate. However, the court's sanction was not a proper civil contempt sanction because it was not directed at enforcing compliance with the trial court's prior orders but was intended to compensate the estate for the personal items.

¶ 2    Contemnor, Nathan Nicholas, appeals from an order of the circuit court of Kane County finding him in indirect civil contempt and imposing sanctions for failing to comply with the trial court's order directing him to turn over certain property to the estate of his deceased fiancée, Megan Ann Schlaiss. For the reasons that follow, we affirm in part, reverse in part, and remand.

¶ 3                                    I. BACKGROUND

¶ 4    On October 15, 2021, Debra Schlaiss, Megan's mother, filed a petition for letters of administration for Megan's estate. Megan died on September 16, 2021. According to the affidavit

of heirship, Megan was never married and had three surviving minor children: A.B., J.S., and Q.N. On October 28, 2021, the trial court issued letters of office appointing Debra as independent administrator.

¶ 5    On June 6, 2023, Nathan, as personal representative of Q.N., filed a "Petition to Terminate Independent Administration, for Accounting, and for Inventory." When Megan died, she and Nathan were engaged and living together.

¶ 6    On November 20, 2023, Megan filed an inventory (the inventory), which the trial court later accepted and approved. According to the inventory, "[t]he approximate value of [Megan's] personal estate as of date of death was $5,009.20." The inventory listed the following personal property:

"1. Chase Bank checking account ending in [*******] titled in the name of Megan Schlaiss, with date of death value of: $3,339.47[;]

2. 2021[1] Ford Escape Limited 4D Sport Utility; VIN No. *****************; location under investigation[;]

3. 2009 Mitsubishi Sports Utility Vehicle; location under investigation[;]

4. Goods and Chattels, located at ***, Elburn, Illinois at date of death[;]

5. Contents of Storage Unit, location under investigation[;]

6. Final paycheck and employee benefits from Logicoll, LLC, amount under investigation."

---

[1]The record reflects that the Ford vehicle was a 2012 model. To the extent Debra's filings occasionally refer to a 2021 model, those references appear to be inadvertent.

In addition to the personal property, the inventory listed a cause of action: "*Debra Schlaiss, Administrator of Megan Ann Schlaiss v. Northwestern Medicine Aco, LLC, Et. Al.*, 2023 LA 971, pending."

¶ 7 On December 8, 2023, Nathan's petition to terminate independent administration was withdrawn. On December 27, 2023, Nathan's counsel was granted leave to withdraw.

¶ 8 On January 29, 2024, Debra's counsel sent to Nathan, via e-mail and regular mail, a letter seeking the return of Megan's possessions. In addition to the two vehicles and the final paycheck listed in the inventory, the letter sought return of the following additional items: (1) keys to a storage unit in Megan's name, (2) Megan's cremains, (3) Megan's brother's cremains, (4) Megan's handgun, (5) Megan's personal files, (6) vintage ceramic tea set, (7) Princess Diana doll, (8) freestanding room divider/picture frame, (9) two printers, (10) desk with file cabinets and its contents, (11) silverware set, (12) radio/record/CD player, (13) cell phone, and (14) television.

¶ 9 On January 31, 2024, the trial court entered an order indicating that the parties had appeared for status that day. Nathan advised the court that he did not intend to hire counsel. The court directed Nathan to cooperate with Debra as independent administrator. (The record does not contain a report of this proceeding.)

¶ 10 On March 7, 2024, the parties appeared again for status. (The record does not contain a report of this proceeding.) The trial court's order noted that the parties were present and that the court was "fully advised in the premises that Nathan *** has stated that he does not intend to retain counsel." The order directed Nathan "to turn over estate assets and/or materials to which he has no authority." The order listed all items from the inventory and now also included Megan's "cremains." It specifically identified (not in this particular order): (1) Megan's cremains; (2) a Chase bank account; (3) Megan's "[f]inal paycheck and employee benefits"; (4) a "2021 Ford

Escape Limited 4D Sport Utility, VIN ****************"; (5) a "2009 Mitsubishi Sports Utility Vehicle"; (6) "[g]oods and [c]hattel" previously located at Nathan's and Megan's Elburn address; and (7) the "[c]ontents of [a] [s]torage [u]nit." The order provided further: "Should Nathan *** fail to cooperate, a Rule to Show Cause shall issue." The matter was continued to April 10, 2024, for status on Nathan's compliance.

¶ 11 On April 11, 2024, Debra's counsel appeared. (The record does not contain a report of this proceeding.) According to the trial court's written order, the court was advised that Nathan had not turned over the items as directed. The matter was continued to May 2, 2024, "for Status and Petition for Rule to Show Cause."

¶ 12 On April 26, 2024, Debra filed "Petition for Leave to Issue Rule to Show Cause." Debra alleged that, "[o]n March 7, 2024, this [c]ourt entered an order directing [Nathan] to turn over estate assets and/or materials to which he has no authority." Debra further alleged that, "[t]o date, [Nathan] has failed and refused to turn over any of the assets identified in Megan's estate [i]nventory." Debra attached to the petition: (1) the inventory; (2) the January 29, 2024, correspondence; (3) the January 31, 2024, order directing Nathan to cooperate with Debra as independent administrator; and (4) the March 7, 2024, order directing Nathan to turn over Megan's cremains and possessions.

¶ 13 On May 2, 2024, the parties appeared for status on the petition for rule to show cause. (The record does not contain a report of this proceeding.) According to the written order, the trial court, "being fully advised in the premises," found as follows: "Based upon the allegations in the Petition for Rule to Show Cause and his admission that he has not turned in the subject items, Nathan *** has violated the March 7, 2024[,] [c]ourt [o]rder." The court ordered that "[r]ule to [s]how [c]ause shall issue against Nathan ***, requiring him to appear in court and show cause, if any, why he

- 4 -

should not be held in indirect civil contempt of court." Nathan accepted service of the rule in open court. The court granted Nathan time to file a response and Debra time to file a reply. The matter was set for hearing on July 8, 2024, and later continued to September 10, 2024. (No response or reply was filed.)

¶ 14 On September 4, 2024, Debra filed a motion asking the trial court to order the release of unredacted full title searches for the Ford vehicle referenced in the inventory.

¶ 15 On September 10, 2024, the parties appeared for a hearing on the petition. (The record does not contain a report of this proceeding.) Based on Nathan's conduct at the hearing, the trial court entered an order adjudicating Nathan to be in direct criminal contempt and sentencing him to 180 days in the Kane County jail (September 10, 2024, to March 9, 2025). According to the written order, during the hearing, Nathan "shouted profanities at the judge repeatedly, at the security officers who responded, and at the parents of [Megan] in the courtroom, and resisted the efforts of the security officers to remove [him] from the courtroom."

¶ 16 That same day, the trial court entered a second order finding Nathan in contempt for violating the March 7, 2024, order. The boxes next to "Judgment to enter" and "Upon trial or hearing" were marked with an X. The following was handwritten at the bottom:

"(1) [Nathan] is found in contempt of court for willfully violating the 3/7/2024 court order and failing to provide reasonable justification &/or credible justification for non-compliance.

(2) He is ordered to return said items &/or their reasonable value within 7 days after release from detention per separate contempt order or 187 days, whichever sooner."

The order also indicated that the petition for rule to show cause was continued to March 25, 2025.

¶ 17    On September 11, 2024, the trial court entered an order authorizing the release of unredacted full title searches for the Ford and Mitsubishi vehicles referenced in the inventory.

¶ 18    The matter was later continued to April 2, 2025.  On April 1, 2025, new counsel entered an appearance for Nathan, and the matter was continued to July 17, 2025.  Nathan was given time to file a response to Debra's petition, and Debra was given time to file a reply.

¶ 19    On May 14, 2025, Nathan answered the petition.  Nathan asserted, among other things, that Megan's cremains were already in Debra's possession, the Ford and Mitsubishi belonged to him, Debra told him to withdraw the money from the Chase account, Debra already received Megan's employee benefits, and he did not know where some of Megan's personal property was located. He argued further that he could not comply with the court order, given his lack of knowledge as to the whereabouts of Megan's possessions.

¶ 20    On September 11, 2025, the trial court ordered that "[b]y agreement of the parties, the hearing on the Petition for Rule to Show Cause is entered and continued for hearing to October 23, 2025."

¶ 21    The hearing on Debra's petition ultimately took place on October 23, 2025.  The trial court heard testimony from Nathan, Debra, and Jessica Leffew.  Nathan testified that he last possessed Megan's cremains on "Christmas of '21."  According to Nathan, he gave them to Debra.  He also testified that he brought Megan's brother's cremains to his "former lawyer's office a couple years ago."  Nathan had "no idea" where Megan's handgun was.  He knew that she had purchased a handgun, but he "ha[d] no idea where she put it or what she did with it."  Nathan agreed that he and Megan were living together when she died.  He did not know the current location of the personal items Megan owned when she died.  He testified that when he moved out of the home where he lived with Megan, he left "a lot of stuff" behind.  He explained that he had to move out

quickly because he was "breaking the lease" and did not want to be fined by his landlord. He did not let anyone know about Megan's possessions because he had no reason to believe that anybody wanted them. Nathan was asked specifically about a "silverware set *** that belonged to Megan's grandmother" and a "vintage china [*sic*] ceramic tea set." Nathan said he did not know the whereabouts of either item.

¶ 22 Nathan testified that he and Megan had rented a storage unit in Elburn, but he did not know whose name it was under. According to Nathan, everything was removed from the storage unit "[t]wo or three years ago." Upon further questioning, Nathan stated that he packed up what was his and left behind what he did not want. Nathan asked Debra several times if she wanted anything from the storage unit, but she always "had some reason as to why she could not make it." Nathan was asked, "And when did you go out and empty it?" He replied that he did not know the exact date.

¶ 23 Nathan testified that Megan had owned two cars, one of which was a Ford Escape. According to Nathan, before she died, Megan executed a bill of sale of both vehicles to Nathan. Nathan claimed that the transfer was done to avoid the requirement that the vehicles "pass emissions" because "[i]t was too much money to put them in the car to get it to just pass emissions." He stated that, "in Elburn, you don't need to pass emissions." Because Nathan's driver's license showed the Elburn address where he and Megan lived, Megan transferred title of both vehicles to Nathan. At that time, Megan had not yet changed her driver's license to reflect the Elburn address; according to Nathan, she did not want to get a new license until after her baby was born and she lost her "baby weight." Nathan later registered the vehicles in his name. Subsequently, he sold one of the vehicles—the Mitsubishi—to his aunt for about $1,200; she paid in cash.

¶ 24  Nathan did not recall ever having Megan's birth certificate, Social Security card, or other personal documents. Nathan testified that he cashed Megan's final paycheck from Logicoll, LLC, at Debra's direction to use it to take care of Megan's children. He also cashed out Megan's Chase bank account at Debra's direction. He had no receipts for any of the money that he spent. He did not have any of Megan's clothing or furniture. He did not have any of Megan's jewelry other than the engagement ring that he had given her.

¶ 25  On cross-examination, Nathan testified that no one ever told him what to do with Megan's property after she died. He stated that it was not until two years after Megan died that he first received a letter (presumably the January 29, 2024, letter) from Megan's attorney asking for Megan's possessions. He could not confirm whether he was still living at the Elburn address at that time or whether he received the letter via e-mail or regular mail.

¶ 26  Leffew testified that Megan had been her best friend. After Megan died, Leffew visited Nathan at his house to check on him and Megan's two older boys. On another occasion, on September 7, 2022, Leffew went to the house to retrieve some of Megan's cremains so that she could release them into the ocean on the first anniversary of Megan's death. While at Nathan's home, Leffew saw an urn containing Megan's cremains and took a picture of it. A screenshot of the photograph was admitted into evidence. The photograph depicts an urn engraved with: "In Loving Memory of Megan Ann Schlaiss 1987-2021." The timestamp on the photograph was September 7, 2022, at 7:37 p.m. Leffew was given a portion of Megan's remains on that date. She did not see the urn again after that day.

¶ 27  Debra testified that she never told Nathan to cash Megan's final paycheck or to remove money from Megan's Chase bank account. Debra testified that her son, Daniel Schlaiss, sold his car—a Ford Escape—to Megan. Debra was shown two certificates of title for the Ford Escape:

one assigned title from Daniel to Megan, and the other assigned title from Megan to Nathan. Both bore a signature attributed to Megan. However, according to Debra, only the signature on the assignment of title from Daniel to Megan looked like Megan's signature. Debra testified that she was able to identify Megan's signature due to the "specific" way Megan wrote certain letters.

¶ 28    Debra testified that she never received the keys to Megan's storage unit. She never went to the storage unit because she did not have the keys. When she called to inquire whether there were any outstanding bills for the storage unit, she was told no. Debra never received any of the requested items from Nathan, including the Mitsubishi. Nathan never gave her Megan's cremains.

¶ 29    On cross-examination, Debra testified that Nathan never reached out to have her retrieve Megan's items from the storage unit. Debra bought Megan a desk in 2019 for $75 when Megan lived in Aurora. Megan moved out of her Aurora apartment in April 2021 and moved in with Nathan. Debra lived with Megan from 2019 until April 2021. Debra visited Megan in Elburn "every few months" and talked to her every day. Megan did not recall being asked at the funeral home whether she wanted Megan's cremains split into three urns, but she knew that the cremains were placed in one urn.

¶ 30    On redirect examination, Debra testified that she visited the Elburn house after Megan died. She recalled seeing Megan's cremains along with her dresser and various personal items. She did not see any family photographs.

¶ 31    Nathan was recalled to testify. Nathan testified that, while at the funeral home, he had asked about placing Megan's cremains into three urns so that he, Daniel, and Debra could each have an urn. According to Nathan, Debra wanted the cremains put into one urn and said that he could have them. Nathan testified that Megan signed over the titles to the vehicles before giving birth and that he put the vehicles in his name after she had died.

¶ 32    After the parties' closing arguments, the following colloquy took place:

"THE COURT: ***

I have a fairly good recollection of this entire case. And it seems like, when Megan died, no one was ready for it or probably could be ready for it. And I'm sure it was very upsetting to [Nathan] and, obviously, to Megan's family—rest of Megan's family.

However, as we've gone through the history of this case, [Nathan] was the last person to have access to the house or apartment, was the last person in the family to have access to the storage unit or certainly after Miss Megan had died, and, basically, at a minimum, left everything in either the apartment or the house or in the storage unit. Walked away from it. There are certain obligations you have to basically to preserve the property of Megan. If the roles were reversed, she would have had a duty to protect this property.

And as far as the ashes go, we've heard various accounts of that through the history of the case. And now we have evidence.

Anyway, I'm finding [Nathan] in contempt for the—Ms. Reed, you mentioned three things, failure to obey the orders. What else was there?

ATTORNEY REED [(DEBRA'S COUNSEL)]: For failure to obey the—I believe there was two different orders, one for him to return the items, and then there was a different order finding that he was in violation of that order and indicating that items should be returned within seven days upon his release.

THE COURT: All right. I will find—make those findings.

As far as penalty, Ms. Reed, any suggestion?

One, he's got to return the engagement ring, wedding ring, whatever it is, within 10 days. And, Ms. Reed, it can be at your office, or it can be at Ms. Becker's office.

ATTORNEY REED: Okay.

THE COURT: Any other suggestions?

ATTORNEY REED: Judge, I am really stuck here. I understand he's claiming up and down he doesn't have the ashes. I would still like in the order that he has to return the ashes within 10 days. Figure out where they are, bring them out of nowhere, I don't know.

If he doesn't, then my client can take that to wherever they need to to follow up with that.

THE COURT: Okay.

ATTORNEY REED: It's hard to put a monetary value on that.

THE COURT: I agree. I agree. Okay.

ATTORNEY BECKER [(NATHAN'S COUNSEL)]: Your Honor, I would suggest, the problem is, is that my client said he handed them to [Debra].

So it's his testimony that he gave them at the hospital. He couldn't possibly have them anymore if he gave them to her.

You know, she says she doesn't have them, but how do we really know she doesn't have them. It's he said, she said. It's not like he's keeping them, because—you know, I mean—

THE COURT: Ms. Becker, his testimony has changed through the history of this case from court appearance to court appearance. And, apparently, there was some—some—there were some proceedings outside of court in the form of possibly deposition or something where, apparently, there's different testimony.

Ms. Reed, my thought is I fine him $50,000.

If he returns the ashes, we cut it to $20,000. Okay?

ATTORNEY BECKER: Wait a minute. So how much is he—

THE COURT: $50,000.

ATTORNEY BECKER: He doesn't have to [*sic*] kind of money, Your Honor.

THE COURT: Make payments. But he gets the ashes back, it goes down to 20. It may even go lower if he brings—gets the ashes back.

As far as the wedding ring, 10 days.

ATTORNEY REED: Okay. Thank you, Judge.

THE COURT: As far as the rest of the furniture, I think that amount of money will cover the value of the rest of the furniture or possessions.

ATTORNEY BECKER: Your Honor, could—if I could.

THE COURT: Go ahead.

ATTORNEY BECKER: If I could interject here.

THE COURT: Just so you know—

ATTORNEY BECKER: It's going to be difficult to find the ashes if he doesn't know where they are. He doesn't have them.

However, the girl, her friend, has 25 percent of the ashes left, she said.

THE COURT: 25—

ATTORNEY BECKER: So maybe we could ask her to return some of them.

THE WITNESS: 25 percent of what she got?

JESSICA LEFFEW: I have them with me.

ATTORNEY REED: As an officer of the court, I did speak to her. She actually gave them back to the family. They put them in the nice urn and said: 'These are yours, we would like our portion that is ours.'

So I don't think that that's a fair assessment. She was given a small portion of the ashes.

And, again, we're done arguing here. But we can't acknowledge that we gave ashes to someone, and we still don't have them.

THE COURT: It's a common courtesy after your fiancée dies, I would think it should be, to contact the decedent's family and say: 'What do you want? Where do I deliver them? Where do you want to pick them up?'

That's common human courtesy, and that's why I'm making this finding. All right.

ATTORNEY REED: Thank you, Judge. I'll draft the order."

¶ 33 The trial court's written order provided, in relevant part:

"1. [Nathan] is held in contempt of court for violating the March 7, 2024[,] order as well ass [*sic*] the September 10, 2024[,] order;

2. [Nathan] must return Megan['s] *** engagement right within 10 days ***; and

3. [Nathan] to pay $50,000.00 to Megan['s] *** estate or, if Megan['s] *** ashes are returned, $20,000.00 to the Estate."

¶ 34 Nathan timely appealed.

¶ 35                              II. ANALYSIS

¶ 36 Nathan contends that the trial court erred in holding him in indirect civil contempt. Nathan asserts that there are "two problems" with the trial court's contempt order: (1) "contempt requires the non-compliance to be willful" and (2) "the remedy must be ameliorative rather than punitive." We treat his first assertion as a challenge to the sufficiency of the evidence and his second assertion as a challenge to the propriety of the monetary sanction.

¶ 37 We begin by setting forth the applicable legal principles:

"Contempt may be either civil or criminal and either direct or indirect, with varying due process requirements depending on the classification. [Citation.] Whether contempt is civil or criminal turns on the purpose of the contempt charge. [Citation.] Criminal contempt is used to punish past contumacious conduct, including 'an act committed against the majesty of the law in disrespect of the court or its process' [citation], whereas civil contempt is used as a means to compel compliance with a court order, usually 'for the benefit or advantage of another party to the proceeding' [citation]. [Citation.] 'Civil contempt proceedings have two fundamental attributes: (1) [t]he contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order.' [Citation.]

Contempt, whether civil or criminal, may be direct or indirect. The distinction between direct and indirect contempt largely depends on where the contumacious conduct took place. [Citation.] Direct contempt occurs in the judge's presence or in an 'integral or constituent part of the court.' [Citation.] All other contempt is indirect and includes all contempt that does not occur in such proximity to a court; it 'must be established by the presentation of evidence.' [Citation.] A finding of indirect civil contempt relies on the existence of a court order and willful disobedience of that court order." (Internal quotation marks omitted.) *People v. Weinstein*, 2024 IL App (2d) 230062, ¶¶ 105-06.

Thus, "a party may be held in civil contempt for willfully failing to comply with a court order." *In re Marriage of Harnack*, 2022 IL App (1st) 210143, ¶ 46.

¶ 38 Alleged contemnors are guaranteed certain due process protections in proceedings for indirect contempt. *People ex rel. Williams v. Williams*, 156 Ill. App. 3d 438, 442 (1987). With regard to indirect civil contempt, the alleged contemnor is entitled to minimal due process. *In re*

*Marriage of Betts*, 200 Ill. App. 3d 26, 52-53 (1990). The alleged contemnor must be informed of the charges against him or her " 'by information, notice, citation, or rule to show cause,' " allowed to file an answer, and accorded a fair hearing. *Williams*, 156 Ill. App. 3d at 442 (quoting *People v. Javaras*, 51 Ill. 2d 296, 300 (1972)); see also *Betts*, 200 Ill. App. 3d at 52-53 (noting that in civil contempt, the contemnor is entitled to minimal due process, consisting of notice and an opportunity to be heard).

¶ 39    "A petition for a rule to show cause is the method by which a party seeks enforcement of a court order, by bringing to the court's attention the opposing party's alleged violation of that order." *Weinstein*, 2024 IL App (2d) 230062, ¶ 104. "The rule to show cause is the method by which the court brings the parties before it for a hearing; it is not itself a contempt finding." (Internal quotation marks omitted.) *Id.* ¶ 108.

> "Initially, the burden falls on the petitioner in a rule to show cause to establish, by a preponderance of the evidence, that the alleged contemnor violated a court order and, therefore, should be held in contempt. [Citation.] 'Noncompliance with a court order is *prima facie* evidence of contempt.' [Citation.] Once that burden is satisfied, the burden shifts to the contemnor, who has the burden of showing that the violation was not willful and contumacious and that he or she had a valid excuse for failing to follow the order. [Citation.] 'Contumacious conduct consists of conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or lessening the authority and dignity of the court.' (Internal quotation marks omitted.) ***." *In re J.S.*, 2022 IL App (1st) 220083, ¶ 72.

"An alleged contemnor's inability to comply with an order is a defense to contempt, but that defense is unavailable where the contemnor has voluntarily created the inability to comply."

*Harnack*, 2022 IL App (1st) 210143, ¶ 52. " 'Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court should not disturb the trial court's determination unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion.' " *In re Marriage of Spangler*, 2025 IL App (2d) 240303, ¶ 26 (quoting *In re Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17).

¶ 40    We first consider whether the trial court's finding that Nathan was in contempt was against the manifest weight of the evidence. On March 7, 2024, the trial court ordered Nathan to turn over to Debra "estate assets and/or materials to which he has no authority." As noted, the order specifically identified (1) Megan's cremains, (2) a Chase bank account, (3) Megan's final paycheck, (4) a Ford vehicle, (5) a Mitsubishi vehicle, (6) "[g]oods and [c]hattel" previously located at Nathan and Megan's Elburn address, and (7) the "[c]ontents of [a] [s]torage [u]nit." At the contempt hearing, Debra testified that Nathan had not given her Megan's cremains or any of Megan's possessions. Thus, she established a *prima facie* case for indirect contempt of court, which shifted to Nathan the burden to establish that his noncompliance was not willful or contumacious but based on a valid excuse. See *J.S.*, 2022 IL App (1st) 220083, ¶ 72.

¶ 41    Nathan testified that he did not have Megan's cremains. He claimed that he last had them on "Christmas of '21" and that he had given them to Debra. However, this testimony was contradicted by Debra. It was also contradicted by Leffew, who testified that she was at Nathan's house on September 7, 2022—after the time Nathan claimed to have given Megan's cremains to Debra—and that Nathan had given her some of Megan's cremains. Leffew's testimony was supported by a photograph of the urn containing Megan's cremains, bearing a timestamp of September 7, 2022, at 7:37 p.m.

¶ 42   Nathan also testified that he did not have any of Megan's possessions. He claimed that Debra told him to withdraw the funds in Megan's bank account and to cash her final paycheck. As for Megan's vehicles, he claimed that Megan had transferred title of both vehicles to him shortly before she died and that he later sold the Mitsubishi to his aunt. He further claimed that no one told him what to do with Megan's possessions after she died. He stated that he left some items behind at the Elburn residence when he moved and that he left some items in their shared storage unit. We note that Debra's testimony contradicted Nathan's testimony regarding the bank account and final paycheck. She also testified that the signature on the title assignment for the Ford was not Megan's.

¶ 43   In finding defendant in contempt, the trial court stated: "[A]s far as the ashes go, we've heard various accounts of that through the history of the case. And now we have evidence." When Nathan's counsel argued that "[i]t's he said, she said," the court noted that "[Nathan's] testimony has changed through the history of this case from court appearance to court appearance." Clearly, the court found incredible Nathan's testimony that he had given Megan's cremains to Debra and no longer had them. See *People v. Johnson*, 2017 IL App (1st) 162876, ¶ 17 (noting that the trial court, in civil contempt proceedings, is in a superior position to ascertain witness credibility). Given Leffew's testimony that she saw Megan's cremains in Nathan's possession after the time he claimed he had given them to Debra, we cannot say that this determination is so unreasonable, improbable, or unsatisfactory as to require a different conclusion. See *People v. City of East St. Louis*, 206 Ill. App. 3d 626, 639 (1990) ("Where an evaluation of credibility or the weight of the evidence was made by the circuit court, a court of review cannot substitute its judgment for that of the trier of fact unless the evidence is so unreasonable, improbable, or unsatisfactory as clearly

- 17 -

to require a different conclusion."). Accordingly, we find no error in the court's finding that Nathan was in contempt of court for failing to comply with its order to turn over Megan's cremains.

¶ 44 Regarding Megan's possessions, Nathan maintains that the trial court expressly found that Nathan no longer had Megan's possessions. We disagree with this assertion. When discussing the possessions, the court stated that Nathan, "at a minimum, left everything in either the apartment or the house or in the storage unit. Walked away from it." By stating that, "at a minimum," Nathan walked away from Megan's possessions, the court identified only the minimum factual finding that it believed could be drawn from Nathan's testimony. The statement did not foreclose the possibility that the court also believed that Nathan continued to retain Megan's possessions. Further, in making this statement, the court seemed to be addressing only the personal items left in the Elburn residence and storage unit; it did not comment specifically on the bank account, final paycheck, or the two vehicles allegedly transferred to Nathan. In any event, the court found Nathan in contempt for failing to comply with its order to return all listed items. As noted, Debra testified that she did not tell Nathan to remove money from Megan's account or cash her final paycheck. She testified further that the signature on the Ford's title assignment was not Megan's. Given Debra's testimony, we cannot say that the court's contempt finding against Nathan was so unreasonable, improbable, or unsatisfactory as to require a different conclusion. Accordingly, we find no error in the court's finding that Nathan was in contempt of court for failing to comply with its order to turn over Megan's possessions.

¶ 45 We turn now to the propriety of the trial court's sanction. We note first that the contempt order did not direct Nathan to turn over any of Megan's possessions. It provided only that Nathan must "pay $50,000.00 to Megan['s] *** estate or, *if Megan['s] *** ashes are returned*, $20,000.00 to the Estate." (Emphasis added.) In determining the amount of the sanction, the court stated:

"[M]y thought is I fine him $50,000. If he returns the ashes, we cut it to $20,000." The court later added: "It may even go lower if he brings—gets the ashes back." This was error.

¶ 46    Civil contempt is intended to coerce future conduct rather than punish past conduct. *Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007); see also *In re Marriage of Blankshain*, 346 Ill. App. 3d 750, 752 (2004) ("A civil contempt proceeding seeks to coerce the contemnor to comply with a court order, and unlike a criminal contempt proceeding, its goal is not punishment."). Therefore, a valid purge condition must be a part of an indirect civil contempt order. *Felzak*, 226 Ill. 2d at 391. "A contemnor must be able to purge the civil contempt by doing that which the court has ordered him to do." *Id.*; see *In re Marriage of Logston*, 103 Ill. 2d 266, 289 (1984) ("the civil contemnor must be provided with the 'keys to his cell' ").

¶ 47    Here, the trial court's order can be reasonably construed as an attempt to coerce Nathan into complying with its prior orders to return Megan's cremains. If Nathan returned Megan's cremains, the sanction would drop from $50,000 to $20,000. However, Nathan had no way to purge the civil contempt finding. As noted, a fundamental attribute of civil contempt proceedings is that " 'no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order.' " *Weinstein*, 2024 IL App (2d) 230062, ¶ 105 (quoting *Betts*, 200 Ill. App. 3d at 44). Under the order, even if Nathan complied by returning Megan's cremains, the $20,000 "fine" would remain. Because the sanction was designed not to compel Nathan's future conduct but to address his past conduct, it was like a criminal contempt sanction. See *Helm v. Thomas*, 362 Ill. App. 3d 331, 333-34 (2005) (monetary sanctions issued after mistrial due to discovery violation were not "impose[d] *** to compel a future act, but to punish [the plaintiffs and their trial counsel] for prior conduct that they could not undo"); *In re Marriage of Carpel*, 232 Ill. App. 3d 806, 815, 823 (1992) ($1,000 sanction issued following visitation violations was imposed for "what [the

respondent] had *already* done" (emphasis in original)). A criminal contempt sanction cannot be imposed without affording the contemnor certain constitutional protections. See *Windy City Limousine Co. v. Milazzo*, 2018 IL App (1st) 162827, ¶ 46. There is no dispute that Nathan received none of those protections. Thus, the court's sanction was improper.

¶ 48    Nonetheless, Debra contends that the sanction was proper because the remaining $20,000 represented the value of the possessions not returned by Nathan. She points to the following comment made by the trial court when imposing the sanction: "As far as the rest of the furniture, I think that amount of money will cover the value of the rest of the furniture or possessions." She notes, too, that in its September 10, 2024, order, the court ordered Nathan to return Megan's possessions "&/or their reasonable value." Thus, according to Debra, the $20,000 fine, which would be imposed even if Nathan returned Megan's cremains and purged the $30,000 fine, was valid. We disagree.

¶ 49    Our court has observed that "compensatory damages may not be awarded in a civil contempt proceeding." *Blankshain*, 346 Ill. App. 3d at 752.

> " 'In Illinois, it is well established that civil contempt is an affront to the authority of the court and not a private remedy, that any fine imposed pursuant to the contempt is payable to the public treasury and not a plaintiff, and that a plaintiff may not recover compensatory damages in a civil contempt proceeding. [Citations.] Because a sanction in a civil contempt proceeding is strictly coercive, the court is without the authority to compensate an aggrieved party for its damages.' " *Id.* at 753 (quoting *Keuper v. Beechen, Dill & Sperling Builders, Inc.*, 301 Ill. App. 3d 667, 669-70 (1998)).

Notably, in its October 27, 2025, contempt order, the court never expressly ordered Nathan to comply with its prior order to return Megan's possessions; instead, it essentially determined that

$50,000—$30,000 for Megan's cremains (if he failed to return them) and $20,000 for Megan's property—would adequately compensate Debra for Nathan's failure. To the extent that the trial court intended to compensate Debra for Nathan's failure to return Megan's possessions, the court's gesture was improper.

¶ 50 Alternatively, even if the $20,000 can be deemed a proper sanction for indirect civil contempt, it was imposed without proper procedures. The rule to show cause was issued on May 2, 2024—before the September 10, 2024, order—and thus did not place Nathan on notice that he could be held in contempt for refusing to return the possessions "&/or their reasonable value." See *Williams*, 156 Ill. App. 3d at 442 (the alleged contemnor must be informed of the charges against him or her " 'by information, notice, citation, or rule to show cause,' " allowed to file an answer, and accorded a fair hearing (quoting *Javaras*, 51 Ill. 2d at 300)).

¶ 51 Finally, we note that, even if the $30,000 portion of the total sanction was viewed separately as a coercive sanction with respect to the return of Megan's cremains, it was improper for the trial court to order that it be paid to the estate. As noted, " 'any fine imposed pursuant to the contempt is payable to the public treasury and not a plaintiff.' " *Blankshain*, 346 Ill. App. 3d at 753 (quoting *Keuper*, 301 Ill. App. 3d at 669-70). Here, the court ordered the money payable to the estate, making it improperly compensatory.

¶ 52                                  III. CONCLUSION

¶ 53 For the reasons stated, we affirm the trial court's order finding Nathan in indirect civil contempt; however, we vacate the sanction imposed and remand for further proceedings. We caution the trial court that, if it intends to coerce Nathan's compliance with its order to return Megan's cremains and possessions, it should identify with specificity, based on the evidence

presented at the hearing and Nathan's ability to comply, (1) the particular item or items that it is ordering Nathan to return and (2) any related sanction.

¶ 54    Affirmed in part; reversed in part; and remanded for further proceedings.